IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § § | |
| Plaintiff, | § § | |
| v. | § § | 1:22-CR-285 |
| RYAN DION LINCOLN, | § § | |
| Defendant. | § § | |

**ORDER**

Before the Court is Defendant Ryan Dion Lincoln's Motion to Suppress. (Mot., Dkt. 23). The United States of America ("the Government") filed a response. (Dkt. 26). On May 4, 2023, the Court held an evidentiary hearing and heard oral arguments. Having considered the motion, the Government's response, the parties' oral arguments, and all other relevant filings and evidence, the Court will deny the motion.

**I. BACKGROUND**

Defendant moves to suppress evidence seized during a search of his vehicle following a canine free-air sniff conducted during a traffic stop. Witness testimony and other evidence at the hearing, including camera footage of the traffic stop in question, established the following facts.

**A.  DEA Taskforce Investigation**

On December 1, 2022, a multi-agency taskforce comprised of members of the Cedar Park Police Organized Crime Unit, the Texas Department of Public Safety ("DPS"), and the U.S. Drug Enforcement Agency ("DEA") conducted a controlled purchase of narcotics utilizing a DPS confidential source. The source had previously identified an individual known as "Blue" as a supplier of kilogram-quantities of methamphetamine and cocaine. Officers determined that Blue's phone

number was registered to Defendant, who was already known to taskforce officers due to his involvement in previous narcotics investigations.

Officers had the source call Defendant on a recorded line and arrange to purchase one kilogram of methamphetamine. Defendant was recorded stating that one kilo of meth would cost $3,800 and telling the source to meet him at a residential address. Officers gave the source marked currency to pay for the drugs and fitted him with a monitored transmission device. A surveillance team watched the source meet Defendant at the agreed location, where Defendant was sitting inside a black Land Rover with California license plates. After a short time, the source left the residence with the kilogram of methamphetamine and met up with taskforce officers at a secure location. When officers searched the source's vehicle, they discovered an additional concealed kilogram of cocaine, which had not previously been in the source's possession and was not authorized as part of the controlled purchase. The source stated Defendant gave him the cocaine.[1]

Later that day, taskforce officers set up a second controlled purchase from Defendant using the same confidential source. At approximately 8:00pm, the source called Defendant on a recorded line and arranged to purchase another kilogram of methamphetamine. Surveillance officers went to Defendant's address and observed his vehicle parked in front, then listened on a recorded line as Defendant and the source agreed to conduct the transaction at a new delivery point. When officers observed Defendant leave in his car to meet the source, they coordinated with DPS Highway Patrol to conduct a "directed" or "wall off" traffic stop. DPS Special Agent Ange Amani notified DPS Trooper Donald Merchant, a certified drug canine handler, of Defendant's location and vehicle description. He instructed Trooper Merchant to conduct a probable cause traffic stop on Defendant, if possible, because the taskforce suspected Defendant was transporting narcotics.

---

[1] The confidential source was subsequently indicted and convicted in federal court for the unauthorized cocaine purchase.

### B. Traffic Stop

At approximately 10:37pm, Trooper Merchant observed Defendant's Land Rover traveling on State Hwy 71 in excess of the posted speed limit. He turned on the emergency lights of his patrol car, and Defendant quickly pulled over near the intersection of FM 973 and SH-71. When Trooper Merchant parked behind Defendant, he also observed that Defendant's license plate tags were expired. Defendant was the vehicle's driver and sole occupant. Upon initial contact, Trooper Merchant identified himself and informed Defendant that he had been pulled over for speeding. He asked for Defendant's driver's license and proof of insurance, but Defendant initially handed the officer a credit card by mistake. Defendant stated that he did not have proof of insurance and that he would need to call his girlfriend to send it. Trooper Merchant told Defendant he planned to issue warnings for the speeding violation and expired tags, but that he first needed to run a computer check on Defendant's license and vehicle. Trooper Merchant asked if Defendant was "in any trouble" or had any recent arrests, to which Defendant answered "no." As Trooper Merchant began walking back to his patrol car, Defendant's vehicle engine started. At that point, Trooper Merchant asked Defendant to stand outside of the vehicle for safety reasons, explaining that he did not want to take the chance of getting into a car chase. Defendant stated that the car's engine had started automatically.

Approximately five minutes into the traffic stop, Trooper Merchant ran the computer check on Defendant's driver license, which showed that Defendant was currently on "supervisory release." Trooper Merchant asked Defendant about the circumstances of his probation and stated that he would have to call Defendant's probation officer. Following a brief exchange, Defendant was placed in handcuffs but was informed he was not under arrest. Trooper Merchant then asked Defendant's consent to search his vehicle. After receiving no answer, Trooper Merchant stated that he planned to conduct a canine sniff test and moved Defendant to the backseat of his patrol car.

Approximately fourteen minutes into the traffic stop, Trooper Merchant and his certified drug-detection canine "Frank" conducted a free-air sniff of the vehicle's exterior. Frank positively alerted to the odor of narcotics, prompting Trooper Merchant to search the inside of the car. Behind the passenger seat, Trooper Merchant discovered a large grocery bag containing approximately 974.83 grams of a crystallized substance, later determined to be methamphetamine. The entire duration of the traffic stop lasted approximately twenty minutes. Officers seized the drugs and arrested Defendant. He was subsequently charged with possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1). (Dkts. 1, 12).

### C. Motion to Suppress

Defendant filed the instant motion to suppress on March 2, 2023. (Mot., Dkt. 23). He contends that Trooper Merchant unlawfully extended the stop to conduct the unrelated canine sniff without having an objective reasonable suspicion that Defendant was engaging in other criminal activity. Accordingly, Defendant seeks to suppress all evidence seized as a result of the vehicle search. *Id.* On March 22, 2022, the Government filed its response, asserting that the warrantless search and seizure was supported by reasonable suspicion based on Trooper Merchant's own observations and those of the narcotics investigators. (Pl.'s Resp., Dkt. 26). On May 4, 2023, the Court held an evidentiary hearing in which testimony was provided by two witnesses: (1) Trooper Donald Merchant; and (2) Cedar Park Police Detective and DEA Task Force Officer Sean Fallon ("TFO Fallon"). (Dkts. 32, 33). The Government admitted four exhibits consisting of video footage from Trooper Merchant's dash and body cameras (Dkts. 34-1, 34-2), and canine Frank's certification and training logs (Dkts. 34-3, 34-4).

### II. LEGAL STANDARD

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. Const. amend. IV. "The essential purpose of the Fourth Amendment is to impose a standard of

'reasonableness' upon law enforcement agents and other government officials in order to prevent arbitrary invasions of the privacy and security of citizens." *United States v. Hunt*, 253 F.3d 227, 230 (5th Cir. 2001) (citing *Delaware v. Prouse*, 440 U.S. 648, 653–654 (1979)).

Because traffic stops are considered seizures within the meaning of the Fourth Amendment, courts analyze their lawfulness under the familiar two-part *Terry* framework. *See United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017). First, the Court determines "whether the stop was justified at its inception," that is, whether the officer had an "objectively reasonable suspicion" that a traffic offense occurred or was occurring. *Id.* If the initial stop was justified, the Court must then determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id.* (quoting *Andres*, 703 F.3d at 832).

Generally, a traffic stop must "last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Id.* "Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the search and seizure." *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006). "The determination . . . must be made based on the totality of the circumstances and the collective knowledge and experience of the officers." *Id.* at 631-32 (citation omitted).

Evidence derived from an unreasonable search or seizure generally must be suppressed under the "fruit-of-the-poisonous-tree doctrine." *United States v. Alvarado-Zara*, 782 F.3d 246, 249 (5th Cir. 2015) (citing *United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013)). Where, as here, the evidence at issue was derived from a warrantless search or seizure, the Government bears the bears to show it was obtained in a constitutional manner. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

### III. DISCUSSION

#### A. The Initial Traffic Stop

Although Defendant does not expressly challenge the initial traffic stop, the Court will make a finding on this issue. Where an officer has probable cause to believe that a traffic violation has occurred or is about to occur, she may reasonably stop the vehicle. *See Whren v. United States*, 517 U.S. 806, 810 (1996). Moreover, an officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses. *United States v. Lenz*, 162 Fed. Appx. 379, 382 (5th Cir. 2006). At the evidentiary hearing, Trooper Merchant testified that he observed Defendant travelling above 65 miles per hour in a 65-mile-per-hour zone—a traffic violation. Because this testimony was not contradicted by Defendant or other evidence, the Court finds that the initial traffic stop was reasonable and legal under the Fourth Amendment.

#### B. Scope & Duration of Traffic Stop

The Court next turns to Defendant's argument that Trooper Merchant unlawfully prolonged the traffic stop longer than necessary to pursue an unrelated drug investigation (the canine sniff) without having any reasonable suspicion of other crimes. (Mot., Dkt. 23-1, at 1). Defendant points out that he "immediately found a safe spot to stop and promptly provided the requested documentation." *Id.* at 6. He states that he "did not seem nervous nor did he act suspiciously" and that, prior to conducting the canine sniff, Trooper Merchant had "confirm[ed] that Mr. Lincoln [did] not have any outstanding warrants and express[ed] his intent to issue a citation." *Id.* According to Defendant, these facts show that Trooper Merchant had already completed the purpose of the traffic stop by the time he asked for consent to search the car. *Id.* After that point, Defendant argues, there was no basis to prolong the stop because no suspicious odors were coming from the

6

vehicle and Defendant's "behavior and demeanor did not give rise to anything that would justify continued detention." *Id.*

At the outset, it is not obvious that the traffic stop was prolonged longer than necessary to investigate the speeding violation. Police officers effectuating a lawful traffic stop may permissibly examine the driver's license and proof of insurance, inquire about the purpose and itinerary of the trip, and run a computer check for outstanding warrants. *United States v. Brigham*, 382 F.3d 500, 507–08 (5th Cir. 2004). Here, the canine sniff occurred less than fifteen minutes from the beginning of the traffic stop, while Defendant was still attempting to contact his girlfriend to provide proof of insurance. Moreover, Trooper Merchant had not yet issued any warning tickets. These circumstances suggest that the speeding investigation remained ongoing when the canine sniff occurred. *See Rodriguez v. United States*, 575 U.S. 348, 357 (2015) (noting that the "critical question" for constitutional analysis is "whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop'").

But even assuming Defendant was detained slightly longer than necessary to investigate the initial traffic violation, the Court finds that the detention was supported by reasonable suspicion. Defendant's argument might be more persuasive if the speeding violation was the sole basis for the traffic stop. But that is not the case. As described above, DEA taskforce officers specifically instructed Trooper Merchant to stop Defendant on a traffic violation, if possible, because they suspected he was transporting drugs. TFO Fallon testified during the evidentiary hearing that he and other officers observed Defendant's apparent participation in a controlled drug transaction earlier that day. Defendant was then recorded stating that he was en route to meet the confidential source to make a second delivery. Those observations provided reasonable suspicion to believe Defendant's vehicle contained methamphetamines at the time of the traffic stop. Under the collective knowledge doctrine, that reasonable suspicion was imputed to Trooper Merchant. The collective knowledge doctrine applies so long as there is "some degree of communication" between the acting officer and

the officer who has knowledge of the necessary facts. *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007). Moreover, the doctrine applies whether or not Trooper Merchant knew the specific investigative facts that gave rise to the other officers' reasonable suspicion. *See United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999) ("The officers stopped the van in reliance on the dispatcher bulletin, and therefore were not required to have personal knowledge of the evidence that created [the requesting officer's] reasonable suspicion.")

Trooper Merchant's own observations during the traffic stop further bolstered this reasonable suspicion. An objective reasonable suspicion is based on a flexible, practical assessment of the "totality of the circumstances." *Brigham*, 382 F.3d at 507 (citing *United States v. Arvizu*, 534 U.S. 266 (2002)). "[F]actors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion," and due weight must be given to the reasonable inferences drawn by an officer in light of his experience. *Ibarra-Sanchez*, 199 F.3d at 759. At the evidentiary hearing, Trooper Merchant credibly testified that Defendant exhibited nervous indicators, including by initially providing a credit card instead of driver license. Defendant also started his car engine (intentionally or not) in the middle of the traffic stop. Trooper Merchant also deemed it suspicious that Defendant failed to disclose his probation status in response to being questioned whether he had recently been in trouble. While each of these facts alone may be insufficient, when coupled with the collective knowledge of the narcotics investigators, and considered in the light of Trooper Merchant's experience, they amount to additional reasonable suspicion that justified prolonging the initial traffic stop. *See United States v. Henton*, 600 Fed. Appx. 263, 264 (5th Cir. 2015) ("Given the totality of the circumstances, including the information developed before and after the stop, the officer had reasonable suspicion to prolong the traffic stop.").

This comports with the Supreme Court's decision in *Rodriguez v. United States*, 575 U.S. 348 (2015), which Defendant relies on. *Rodriguez* examined Fourth Amendment implications of

8

performing a canine sniff during a routine traffic stop. There, an officer pulled the defendant over for driving on the shoulder. *Id.* at 348. The officer concluded the initial stop by issuing a warning for the traffic violation and returning the driver's documents. *Id.* Although the officer did not develop reasonable suspicion of other crimes before concluding the traffic stop investigation, he continued detaining Rodriguez for seven minutes while waiting for a second officer to arrive and conduct a canine sniff. *Id.* The Court held that police may not lawfully extend an otherwise-completed traffic stop for any amount of time to conduct dog sniff, absent additional reasonable suspicion. *See id.* In other words, *Rodriguez* counsels that an officer must develop a lawful basis to conduct a canine sniff before the initial traffic stop has concluded. *See id.* at 352. As set forth above, the preponderance of the evidence supports the Government's argument that Trooper Merchant developed reasonable suspicion of narcotics trafficking before and during the initial stop. Therefore, *Rodriguez* does not preclude a finding of reasonable suspicion in this case.

### C. The Vehicle Search

Finally, the Court will address the lawfulness of the search of Defendant's vehicle that followed the positive canine alert. "Warrantless searches and seizures are per se unreasonable unless they fall within a few narrowly defined exceptions." *United States v. Roberts*, 274 F.3d 1007, 1011 (5th Cir. 2001). Consent is one of the exceptions to the warrant requirement. *See id.* The other exception occurs when a search is conducted pursuant to probable cause and exigent circumstances. *United States v. Castelo*, 415 F.3d 407, 412 (5th Cir. 2005) (quoting *United States v. Reyes*, 792 F.2d 536, 538 (5th Cir. 1986)). A probable cause determination is based on the "totality of the circumstances," and the evidence in support of such "must be viewed in light of the observations, knowledge, and training of the law enforcement officers involved in the warrantless search." *United States v. Buchner*, 7 F.3d 1149, 1154 (5th Cir. 1993).

9

As noted above, Trooper Merchant had reasonable suspicion based on his communication with taskforce agents, coupled with his own observations, to prolong the traffic stop and conduct the sniff test. Canine Frank quickly alerted to the odor of drugs within the vehicle. A dog sniff of a vehicle's exterior is not a "search" within the meaning of the Fourth Amendment. *Ibarra*, 493 F.3d at 531. Nonetheless, once a canine alerts to the presence of drugs within a vehicle under suspicion, probable cause to search the vehicle is established. *See United States v. Zucco*, 71 F.3d 188, 191–92 (5th Cir. 1995); *see also Ibarra*, 493 F.3d at 530. Moreover, "[i]n a vehicle stop on a highway, the fact of the automobile's potential mobility supplies the requisite exigency." *United States v. Banuelos–Romero*, 597 F.3d 763, 767 (5th Cir. 2010) (internal quotations and citations omitted). For these reasons, the Court finds that Trooper Merchant had probable cause to search Defendant's vehicle.

## IV. CONCLUSION

For the reasons set forth above, the Court finds that (1) there was probable cause to conduct the initial traffic stop; (2) there was reasonable suspicion to prolong the traffic stop for the purpose of conducting the canine free-air sniff; and (3) the dog's positive alert for the odor of narcotics provided probable cause to search the vehicle's interior. Accordingly, the seizure was lawful.

For these reasons, **IT IS ORDERED** that Defendant's Motion to Suppress (Dkt. 23) is **DENIED.**

**SIGNED** on May 12, 2023

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE